IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

|  |  |  |
|---|---|---|
| APRIL R. D. | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Action No. 2:20-cv-210** |
| | ) | |
| ANDREW SAUL, | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court on Plaintiff April R. D.'s ("Plaintiff") Complaint, ECF No. 1, filed pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Defendant Andrew Saul, the Commissioner of the Social Security Administration ("the Commissioner"), denying Plaintiff's claim for Supplemental Security Disability Income ("SSDI") under the Social Security Act. Plaintiff filed a Motion for Summary Judgment, ECF No. 14, and the Commissioner filed a cross-Motion for Summary Judgment and Memorandum in Support, ECF Nos. 17, 18, which are now ripe for recommended disposition. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002 Standing Order on Assignment of Certain Matters to United States Magistrate Judges. After reviewing the briefs, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary

Judgment, ECF No. 14, be **GRANTED**, the Commissioner's Motion for Summary Judgment, ECF No. 17, be **DENIED**, and the final decision of the Commissioner be **VACATED and REMANDED.**

## I. PROCEDURAL BACKGROUND

Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for SSDI on September 19, 2018, alleging an onset date of March 1, 2018. R. at 23.[1] Her application was initially denied on February 13, 2019, R. at 111, and was again denied upon reconsideration on May 10, 2019. R. at 119. Plaintiff then requested a hearing in front of an administrative law judge ("ALJ"), which was conducted on November 1, 2019. R. at 144. Plaintiff appeared at the hearing with representation and testified, as did an impartial vocational expert and a witness. R. at 45. On December 26, 2019, the ALJ issued a decision denying Plaintiff's application. R. at 39. On February 26, 2020 the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision. R. at 1.

Having exhausted her administrative remedies, on April 25, 2020, Plaintiff filed the instant Complaint for judicial review of the Commissioner's decision. ECF No. 1. The Commissioner filed an Answer on September 14, 2020. ECF No. 10. The matter was referred to the undersigned on September 17, 2020. ECF No. 12. Plaintiff filed her Motion for Summary Judgment and Memorandum in Support on October 19, 2020, ECF Nos. 14–15, and the Commissioner filed a cross-Motion for Summary Judgment and Memorandum in Support on November 18, 2020. ECF Nos. 17–18. The matter is now ripe for recommended disposition.

---

[1] "R." refers to the certified administrative record that was filed under seal on September 14, 2020, ECF No. 11, pursuant to Local Civil Rules 5(B) and 7(C)(1).

## II. RELEVANT FACTUAL BACKGROUND

Plaintiff was born on April 1, 1979 and was thirty-nine years old at the time of her alleged disability onset date, making her a "younger individual" under the Social Security Administration's ("SSA") regulations. R. at 141, 163. *See also* 20 C.F.R. § 416.963(c) (defining anyone under the age of fifty as a "younger person."). On November 1, 2019, Plaintiff appeared with counsel before the ALJ at an administrative hearing. R. at 45. Both the Plaintiff and an impartial vocational expert ("VE") testified at the hearing, along with a witness. *Id.* The record included the following factual background for the ALJ to review.

Plaintiff completed two years of college while she was in the Navy. R. at 246. She testified that she served in the Navy for twenty-one years as a meteorologist before she was medically retired as a result of her alleged impairments. R. at 51, 59. Plaintiff was placed on light duty for six months in 2015 due to her health conditions. R. at 56. Subsequently, Plaintiff was placed on limited duty in March of 2018 and remained on limited duty until she was medically retired in April of 2019. R. at 56, 59. While on limited duty Plaintiff no longer attended work. R. at 60.

Plaintiff stated that she currently lives with her partner. R. at 50. Plaintiff testified that she is mostly homebound and spends her days sitting in bed or in a chair with her feet elevated. R. at 60, 62. For entertainment she watches some television, but she keeps the volume low due to her noise sensitivity. R. at 60–61. Additionally, the motion of the television makes her dizzy. *Id.* Plaintiff testified that she is unable to read for entertainment because her vision gets blurry and "starts to gray out" after ten minutes. R. at 63–64. As for household maintenance, Plaintiff stated that she occasionally does some light cleaning for fifteen or twenty minutes before she is exhausted from pain and dizziness and must sit down. R. at 61. Further, Plaintiff testified that her partner does most of the shopping and cooking and Plaintiff will sometimes reheat food in the microwave

3

or make something that does not require her to stand for longer than ten or fifteen minutes. R. at 63.

### A. Evidence Related to Plaintiff's Alleged Physical Impairments

Plaintiff began seeking regular medical treatment in 2017 for a variety of medical conditions. Plaintiff has a history of a traumatic brain injury ("TBI") from a military training activity in 2011 and subsequent concussions. R. at 1003, 1369. The conditions for which she sought treatment include neck and back pain, R. at 1031; somatic dysfunction of the cervical region, R. at 966; chronic pain syndrome, R. at 969; chronic fatigue, R. at 975; heart palpitations, R. at 982; allergic rhinitis, *Id.*; anxiety disorder, R. at 991; vertigo, R. at 1031; postural orthostatic tachycardia syndrome (POTS), R. at 569; and fibromyalgia, R. at 905, among others.

In January 2018, Plaintiff underwent autonomic testing due to exaggerated orthostatic tachycardia. R. at 947. The testing revealed no evident failure of reflexive control of blood pressure, cardiovagal reflexes, or sudomotor reflexes. *Id.* There was no evidence of orthostatic hypotension. *Id.* On March 1, 2018, Plaintiff saw Douglas McAdams, MD, a neurologist, complaining of chronic headaches and cervicalgia. R. at 946. Plaintiff reported her pain as a seven on a scale of ten. *Id.* Physical examination was normal, and Plaintiff had normal gait and stance, no neurological deficits, and euthymic mood. R. at 947. Dr. McAdams noted that Plaintiff's autonomic testing results from January were suggestive of POTS. *Id.* He placed Plaintiff on limited duty, recommended exercise, and referred her to cardiology for a follow up for tachycardia. *Id.*

On March 2, 2018, Plaintiff saw a cardiologist, complaining of palpitations that had worsened since her last cardiology appointment in 2015. R. at 934. Plaintiff's echocardiogram results and cardiovascular examination were normal. R. at 933–37. The cardiologist assessed

4

Plaintiff with benign palpitations and tachycardia, likely related to her diagnosis of POTS. R. at 938. The cardiologist placed a seven-day ZIO patch monitor, which was benign. R. at 902, 930. The cardiologist released Plaintiff without limitations. R. at 938.

On March 5, 2018, Plaintiff saw pain management for head and neck pain. R. at 912. She again reported a pain level of seven out of ten. *Id.* Plaintiff reported some mild improvement in her POTS symptoms since starting Valium, and noted that she got weekly massages, which temporarily relieved some of her pain. *Id.* Plaintiff stated that she was planning on starting an exercise program with a stationary bike, as recommend by her neurologist. *Id.* Physical examination showed mild tenderness to palpitation through Plaintiff's neck and diminished sensation over her fourths and fifth fingers bilaterally. R. at 913. The examination was otherwise normal, showing active cervical range of motion, normal gross motor movement, and full strength in Plaintiff's upper and lower extremities. *Id.* The physician assessed Plaintiff with cervicalgia and started her on duloxetine, an antidepressant that is also used to treat nerve pain. R. at 915.

On March 22, 2018, Plaintiff returned to the pain clinic, complaining of fibromyalgia, neck pain, TMJ, arm pain, headaches, vertigo, sleep problems, and anxiety. R. at 905. Plaintiff stated her pain was usually a 4–6 out of 10 but could go as high as 9/10. *Id.* The physician noted that Plaintiff's active range of motion in her cervical spine had decreased by twenty percent and that Plaintiff experienced moderate pain at the end of her range of motion, as well as spasms. *Id.* Between March and July, Plaintiff returned to the pain clinic on a regular basis with ongoing complaints of fibromyalgia, neck and back pain, headaches, arm pain, sleep difficulties, and anxiety. R. at 728–29, 756. On May 29, 2018, Plaintiff noted that she had been having more pain in her low back and other areas. R. at 728. In addition to attending pain management, Plaintiff regularly underwent acupuncture, manipulation, physical therapy, and group relaxation for

5

fibromyalgia and cervicalgia, beginning in March 2018 and continuing through January 2019. *E.g.*, R. at 445–46, 546–51, 588, 676, 778–80, 800–01, 856–60, 907–11, 1161–63.

Plaintiff returned for a follow up appointment with Dr. McAdams on March 27, 2018. R. at 898. She reported that taking Valium once or twice per day was helpful, but that she continued to have headaches, dizziness, and blood pooling in her extremities when standing. *Id.* Plaintiff's physical examination was again benign, and she had euthymic mood. R. at 899. Dr. McAdams reported that Plaintiff was working on adjusting her hydration and salt intake related to POTS. *Id.* He adjusted Plaintiff's medications, encouraged her to continue exercising and strengthening her legs, and provided a referral for compression stockings. *Id.*

Plaintiff had a follow up cardiology appointment on April 17, 2018. R. at 862–64. At that appointment she noted that her pain was severe at a seven out of ten on the pain scale. R. at 862. Plaintiff had a recent normal echocardiogram, benign forty-eight-hour Holter monitor, and a normal physical examination with normal heart sounds. R. at 863. At an additional follow up appointment on May 9th, Plaintiff's cardiologist opined that, from a cardiology standpoint, Plaintiff was fit for full duty with no limitations and that exercise should be maximized as tolerated. R. at 865.

On April 30, 2018, Plaintiff returned to her neurologist, Dr. McAdams. R. at 853. She reported that her new medication had worsened her dizziness and caused her to have an upset stomach. *Id.* Plaintiff also complained of new bone and wrist pain and reported that she had tried aqua therapy but found that she didn't feel well afterwards. *Id.* Dr. McAdams again adjusted her medication and referred her for a sleep study. R. at 854. The sleep study was done on August 3rd and found the presence of a sleep disorder, but sleep apnea was ruled out. R. at 648. Plaintiff was released without limitations. R. at 854.

6

In May, Plaintiff saw her primary care physician, Stephani Fofi, MD, to follow up on blood work. R. at 795. At the appointment, Plaintiff also complained of head, neck, knee, and wrist pain with a pain level of eight out of ten. *Id.* Plaintiff had normal heart sounds, unlimited mobility, normal balance, normal gait and stance, and euthymic mood. R. at 796–97. Dr. Fofi assessed Plaintiff with fatigue, adjustment disorder with mixed anxiety, and depressed mood and released her without limitations. R. at 798.

Plaintiff saw Dr. McAdams twice in June of 2018. R. at 752–54, 781–54. On June 1st, Plaintiff reported that her medication gave her constant tingling, goosebumps, and chills and did not relieve her dizziness. R. at 781. Additionally, Plaintiff stated that acupuncture was not helping her pain. R. at 781. On June 29th, Plaintiff noted additional symptoms, including graying vision episodes, photophobia, phonophobia, and discoloration in her extremities. R. at 752–53. As a result, Dr. McAdams referred Plaintiff to rheumatology for her fibromyalgia. R. at 754. Plaintiff was released without limitations after both appointments. R. at 754, 784.

On July 26, 2018, Plaintiff saw Jeffrey Eickhoff, MD, for a rheumatology consultation for her fibromyalgia and widespread pain. R. at 678. Plaintiff complained of all-day stiffness, vertigo, extreme fatigue, and chronic daily migraines. *Id.* Dr. Eickhoff noted that Plaintiff had been diagnosed with POTS by her neurologist. *Id.* Upon physical examination, Plaintiff exhibited eighteen out of eighteen tender points. R. at 680. Dr. Eickhoff diagnosed Plaintiff with fibromyalgia, consistent with the American College of Rheumatology's ("ACR") 2010 diagnostic criteria. R. at 699. Dr. Eickhoff opined that Plaintiff displayed the clinical features of fibromyalgia, including "multifocal axial/peripheral pain above/below waist, non-restorative sleep pattern and extreme fatigue for >3months, as well as a somatic score of 32," noting that a score greater than fifteen is highly indicative of fibromyalgia. R. at 702. Consequently, Dr. Eickhoff

7

stated that Plaintiff could not perform her duties in the Navy due to her chronic diffuse widespread pain, inability to focus and concentrate, and fatigue. R. at 702–03.

Several days later, Plaintiff saw neurologist Michael Wagner, MD for a brain MRI, which was normal. R. at 653–54. Dr. Wagner noted that Plaintiff's past treatments, including medication, Botox, and compression stockings, had been ineffective in relieving her chronic migraines or POTS symptoms. R. at 654. At the appointment Plaintiff's gait was slow, but her physical examination was otherwise normal. *Id.* Dr. Wagner recommended that Plaintiff try a Cefaly device, which is an electromagnetic device that is used to treat headaches. *Id.*

On September 24, 2018, Plaintiff went to a family medicine clinic after her physical therapy session, complaining of increased headaches and dizziness with pain at a level ten out of ten on the pain scale. R. at 571. The clinic noted Plaintiff had a depression on her scalp that was associated with increased pain upon contact but did not think that it was contributing to Plaintiff's exacerbated migraine. R. at 572. The clinic recommended that Plaintiff go to the emergency room for additional treatment and evaluation. *Id.* Two days later, Plaintiff saw a urogynecologist, complaining of frequent urination related to her POTS. R. at 565. Plaintiff represented that she urinates between twenty and thirty times a day. *Id.* The doctor assessed her with overactive bladder and prescribed medication. R. at 568.

Plaintiff returned to neurology in October and November of 2018 for her chronic migraines and to adjust her medications. R. at 513, 535. At each appointment she complained of burning and intolerance of cold in her hands and feet. *Id.* In November, the neurologist opined that this could be due to a small fiber neuropathy and ordered a skin biopsy. R. at 513. The results came back normal. R. at 1170.

In December, MRIs of Plaintiff's lumbar spine and left shoulder were essentially normal and without findings to account for her chronic back pain. R. at 1140–41. Later that month, Plaintiff was seen in the vascular clinic for complaints of upper extremity pain and parasthesia. R. at 449. Plaintiff had pain in her upper extremities when raising her arms above ninety degrees. R. at 450. The provider ordered a brachial plexus MRI to rule out thoracic outlet syndrome as a cause of Plaintiff's arm pain. *Id.* The MRI was taken in January 2019 and was unremarkable. R. at 1142. Plaintiff was assessed with generalized pain syndrome of uncertain origin, resulting in chronic inflammation across her body. R. at 1142–43. Plaintiff reported having pain at a level eight out of ten at that time. R. at 1143.

On December 31, 2018, Plaintiff was seen at Walter Reed National Military Medical Center for POTS. R. at 439. Plaintiff's physical examination was normal, but the record showed abnormal autonomic screening tests, including an exaggerated orthostatic tachycardic response during a tilt table test. R. at 441–42. Glen Cook, MD assessed Plaintiff with POTS arising from her TBI and other head and neck traumas. R. at 443.

**B. Evidence Related to Plaintiff's Alleged Mental Health Impairment**

Throughout the period of her alleged disability, Plaintiff regularly attended individual therapy sessions with Samantha Newton, LCSW, and individual pain psychology appointments with Darren Love, MD. Dr. Love and Ms. Newton diagnosed Plaintiff with anxiety disorder, major depressive disorder, and pain disorder with related psychological factors. *E.g.*, R. at 658. Dr. Love and Ms. Newton treated plaintiff with cognitive behavioral therapy during the relevant period. *E.g.*, R. at 774.

On March 6, 2018, plaintiff saw Dr. Love for an individual pain psychology appointment. R. at 917. Dr. Love noted that Plaintiff scored a 54/70 on the Pain Disability Index, indicating a

9

moderate perception of disability. *Id.* Further, plaintiff scored 44/60 on the Center for Epidemiologic Studies Depression Scale, indicating a major level of depression. *Id.* Plaintiff scored 64/80 on the Zung Self-Rating Anxiety Scale, indicating the most extreme level of anxiety. *Id.* Dr. Love noted that Plaintiff displayed a dysphoric mood but was otherwise alert and fully oriented. *Id.* In her other visits, Dr. Love routinely observed Plaintiff to have a dysphoric mood, but he always concluded that Plaintiff was fit for full duty from a psychological perspective. *E.g.*, R. at 490, 493, 602, 605, 1160.

In May of 2018, Plaintiff told Ms. Newton that her physical symptoms, combined with the stress of a potential Physical Evaluation Board had negatively impacted her mood. R. at 843. Ms. Newton noted that Plaintiff's symptoms of anxiety and depression included difficulty sleeping, daily fatigue, anhedonia, constant worrying, difficulty relaxing, and low energy. R. at 848. Ms. Newton routinely observed that Plaintiff exhibited a depressed/anxious mood but otherwise had normal speech, normal memory and attention, and no suicidal or homicidal ideation. *E.g.*, R. at 432, 663, 844.

On March 22, 2019, Ms. Newton completed a Medical Source Statement finding that Plaintiff had major depressive disorder, somatic disorder, and anxiety disorder. R. at 1656. She indicated that plaintiff had anxiety attacks, isolation tendency, decreased energy, memory loss, difficulty with concentration/focus, flat affect, mood instability, sleep impairment, feelings of guilt/worthlessness, and personality change. *Id.* Ms. Newton noted that Plaintiff had moderate difficulty understanding simple instructions, mild difficulty understanding detailed instructions, and marked difficulty remembering locations and work procedures. *Id.* She also concluded that Plaintiff had marked difficulty maintaining concentration for long periods, working with others without being distracted, responding to changes in the work setting, and responding to normal

levels of stress. *Id.* On April 4, 2019, Dr. Love completed a similar Medical Source Statement, but he found that Plaintiff had extreme difficulty carrying out detailed instructions, maintaining concentration for extended periods, responding to changes in the work setting, responding to normal levels of stress, and travelling in new places or travelling alone. R. at 1658.

## III. THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

A sequential evaluation of a claimant's work and medical history is required in order to determine if the claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). The ALJ conducts a five-step sequential analysis for the Commissioner, and it is this process that the Court examines on judicial review to determine whether the correct legal standards were applied and whether the resulting final decision of the Commissioner is supported by substantial evidence in the record. *Id.* The ALJ must determine if:

> (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.

*Strong v. Astrue*, No. 8:10-cv-357-CMC-JDA, 2011 WL 2938084, at *3 (D.S.C. June 27, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (noting that substantial gainful activity is "work activity performed for pay or profit."); *Underwood v. Ribicoff*, 298 F.2d 850, 851 (4th Cir. 1962) (noting that there are four elements of proof to make a finding of whether a claimant is able to engage in substantial gainful activity)). "An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability." *Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014) (citing 20 C.F.R. § 404.1520).

11

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law. First, the ALJ found that Plaintiff had engaged in substantial gainful activity since March 1, 2018, the alleged onset date; however, the ALJ reserved judgment at this step and reached the decision regarding disability at a later step in the evaluation process. R. at 25. Second, the ALJ determined that Plaintiff suffered from the following severe impairments: orthostatic tachycardia; vertigo; multilevel borderline intraspinal disc encroachment at C3–4, C6–7, and T1–2; high grade chondromalacia of retropatellar cartilage; and migraines. *Id.* These impairments were found to be severe, as they significantly limited Plaintiff's ability to perform basic work activities. R. at 26. Plaintiff alleged other impairments; however, the ALJ determined that these impairments were not severe because they "did not exist for a continuous period of 12 months, were responsive to medication, did not require any significant medical treatment, or did not result in any continuous exertional or nonexertional functional limitations." R. at 26. Further, the ALJ found that Plaintiff's alleged mental impairments of somatic symptom disorder, pain disorder, major depressive disorder, and anxiety disorder are non-severe as, when considered singly and combination, they "do not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities." *Id.* The ALJ also determined that Plaintiff was released from the military "for medical reasons due to inability to carry weapons, not for any mental health issue." *Id.* The ALJ found that Plaintiff's fibromyalgia, traumatic brain injury, chronic fatigue syndrome, thoracic outlet syndrome, and POTS were non-medically determinable impairments. R. at 27.

A 'medically determinable' physical or mental impairment is an impairment that "result[s] from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.921 (2021). To be "medically determinable," an impairment must be "established by objective medical evidence

from an acceptable medical source." *Id.* Objective medical evidence means signs, laboratory findings, or both. Social Security Program Operations Manual System (POMS) DI 24501.020, *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501020. Signs are "anatomical, physiological, or psychological abnormalities that are observable, apart from the claimant's statements." *Id.* Laboratory findings are "anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques." *Id.*

While considering the third step of the sequential analysis, whether "the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments," the ALJ found that Plaintiffs impairments, although severe, "are not attended, singly or in combination, with the specific clinical signs and diagnostic findings required" by the SSA. R. at 27. The ALJ assessed Plaintiff's severe impairments under Listings 1.02 and 1.04 (Musculoskeletal System), and 4.05 (Cardiovascular System). *Id.*

Next, the ALJ determined that Plaintiff has the residual functional capacity ("RFC") to perform light work as defined by SSA regulations, except Plaintiff can "frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl and she can occasionally climb ladders, ropes, and scaffolds." R. at 28. Plaintiff can have "occasional exposure to unprotected heights, moving mechanical parts, wetness, dusts, odors, fumes, pulmonary irritants, and extreme heat." *Id.* However, Plaintiff "cannot tolerate noise above office level" and is limited to "simple routine tasks and limited computer use." *Id.*

Finally, the ALJ determined that Plaintiff was incapable of performing her past relevant work as a meteorologist, as this job is precluded by her RFC. R. at 37. Nevertheless, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including office helper, inspector, sorter, ticket checker, sorter/examiner, and

13

inserter. R. at 38. Therefore, after considering the Plaintiff's age, education, work experience, RFC, and the available jobs that she was capable of performing, the ALJ concluded that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act. R. at 38–39.

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

Plaintiff contends that the ALJ made so many errors in her factual findings and conclusions that a grant of benefits, or at least remand, is required. ECF No. 15 at 15–16. These errors are alleged to include: (1) finding that medical source statements of various treating health care

14

providers were "unpersuasive;" (2) mistakes of fact, including the reason for Plaintiff's medical retirement, that Plaintiff engaged in extensive travel, and the role of military performance appraisals and fitness for duty evaluations; (3) concluding that Plaintiff was not cognitively impaired and ignoring substantial evidence to the contrary; (4) mistaken medical conclusions regarding Plaintiff's alleged medical conditions, such as POTS, swollen extremities, and her TBI; (5) failure to analyze Plaintiff's neurological assessment; (6) mischaracterization of Plaintiff's concerns regarding her medical retirement and the VA disability process; and (7) failure to consider the VA's disability rating, as required by *Bird v. Comm'r*, 699 F.3d 337 (4th Cir. 2012). ECF No. 15.

The Commissioner contends that Plaintiff has waived her arguments by not developing them and merely presenting the same brief as was submitted to the Appeals Council following the ALJ's denial of benefits. ECF No. 18 at 17–18. Alternatively, he argues that Plaintiff's claims of errors or mistakes by the ALJ are not a basis for remand, asserting that the ALJ followed the regulations when evaluating the persuasiveness of the medical providers, *id.* at 18–24, and did not erroneously evaluate statements regarding Plaintiff's inability to perform past work, *id.* at 24. The Commissioner contends the new Social Security regulations—20 C.F.R. § 404.1520b(c)—no longer require the Commissioner to evaluate disability ratings from another agency. *Id.* at 24–25. He asserts that substantial evidence supports the ALJ's determination at step two regarding which impairments were severe, not severe, and not medically determinable, and in any event, that the ALJ properly considered the functional limitations associated with all of Plaintiff's impairments in assessing her RFC. *Id.* at 25–29. Finally, the Commissioner argues that the ALJ properly evaluated Plaintiff's subjective complaints and that her RFC assessment was supported by substantial evidence. *Id.* at 29–30.

**A.  While Plaintiff Failed to Demonstrate that Substantial Evidence Does Not Support the Commissioner's Decision, or that the Correct Legal Standard Was Not Applied, the Court's *Sua Sponte* Evaluation of the Commissioner's Decision Demonstrates Error.**

The Court's role is to determine whether substantial evidence exists in the record to support the Commissioner's final decision, and whether the Commissioner employed the correct legal standard in reaching that decision.  42 U.S.C. § 405(g); *Hays*, 907 F.2d at 1456.  The Court agrees with the Commissioner that Plaintiff's Memorandum in Support of her Motion for Summary Judgment, ECF No. 15, does not present sufficient legal arguments to determine that the Commissioner's decision was not supported by substantial evidence or that the ALJ employed incorrect legal standards.  Merely disputing conclusions reached or pointing out potential mistakes of fact does not establish that the decision was not supported by substantial evidence, or that the ALJ applied an incorrect legal standard.  *See Hays*, 907 F.2d at 1456.

However, the Court is empowered to evaluate the Commissioner's decision *sua sponte* in the absence of sufficient legal arguments from Plaintiff.  A review of the Commissioner's decision must be made based on the record as a whole.  *Flack v. Cohen*, 413 F.2d 278, 279 (4th Cir. 1969).  While the Court generally decides appeals under the Social Security Act by considering the issues raised and argued in a plaintiff's brief, the Court cannot ignore "obvious and prejudicial errors, even if the litigants did not identify and debate them."  *Ricks v. Comm'r of Soc. Sec.*, No. 2:09cv622, 2010 WL 6621693, at *7 n.7 (E. D. Va. Dec. 29, 2010) (quoting *Womack v. Astrue*, No. CIV-07-167-W, 2008 WL 2486524, at *5 (W. D. Okla. June 19, 2008)).  Thus, the Court may evaluate the Commissioner's decision *sua sponte* to determine whether it is supported by substantial evidence and whether the correct legal standards were applied.  *See Ricks*, 2010 WL 6621693, at *7 (citing *Sims v. Apfel*, 530 U.S. 103, 112 (2000) (holding there is no issue exhaustion requirement in non-adversarial Social Security disability proceedings), and *Scott v. Barnhart*, 332

16

F. Supp. 2d 869, 876 (D. Md. 2004) (raising an issue *sua sponte* and noting "a reviewing court cannot properly discharge its judicial review function without an evaluation and explanation of all material evidence.")).

Upon review of the ALJ's decision and the administrative record, the Court **FINDS** that the Commissioner's decision is not supported by substantial evidence. Further, the Court **FINDS** that, at least in one respect, the ALJ applied an incorrect legal standard in evaluating Plaintiff's undisputed medical condition.

**B. The ALJ erred in failing to sufficiently identify support for her conclusions.**

The Court cannot determine that substantial evidence supports the ALJ's decision because of her failure to sufficiently identify the record evidence supporting her conclusions. The ALJ offered conclusory statements that the Medical Source Statement opinions were unpersuasive by saying that they were not consistent with Plaintiff's medical records writ large, without pointing to any specific part of the record. R. at 35. Of particular concern is the fact that the ALJ cited Exhibit 1F only generally more than 160 times to support many of her findings. Exhibit 1F is 863 pages long and contains large parts of Plaintiff's Department of Defense ("DOD") medical record from March 1, 2017 to January 22, 2019.[2] R. at 330–1192. The ALJ also cited Exhibit 2F only generally more than thirty-five times to support additional findings. Exhibit 2F is 462 pages long and contains additional medical records from the DOD from January 22, 2019 to March 19, 2019. R. at 1193–1654.

It is clear to the Court that the Commissioner recognized this problem with the ALJ's decision because he dug through the record to try and find evidentiary support for the ALJ's conclusions, and then provided specific page references in his brief. *See* ECF No. 18, *passim*.

---

[2] The entire administrative record is 1,676 pages long.

Plaintiff, too, in her brief cited specific pages of the record which supported conclusions contrary to those drawn by the ALJ. *See* ECF No. 15, *passim*. Substantial evidence may very well support the ALJ's conclusions, and merely because Plaintiff could cite to other evidence in the record that is more favorable to her case does not necessarily mean the ALJ committed error in finding that Plaintiff's evidence was outweighed by other evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The problem, however, is that the ALJ's failure to cite any specific parts of the record in reaching so many conclusions means that the Commissioner is merely speculating about what parts of the record the ALJ actually relied on. While the Commissioner has tried to salvage the ALJ's decision by finding evidentiary support in the record, it was the ALJ's responsibility in the first instance to point to evidence in the record to support her conclusions, thereby permitting the Court to determine whether she had built "an accurate and logical bridge from the evidence to [her] conclusion." *Monroe v. Colvin*, 826 F.2d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). It is the duty of the ALJ, not the responsibility of the Court or the parties, to "make findings of fact and to resolve conflicts in the evidence." *Hays*, 907 F.2d at 1456.

Consequently, the ALJ's failure to identify with any degree of particularity the evidence upon which her conclusions were based prevents the Court from understanding the "logical bridge" from the evidence to the conclusions. This failure, despite the Commissioner's attempt to guess at what evidence the ALJ relied on, prevents the Court from determining if the ALJ accurately cited the record, selectively cherry-picked unrepresentative evidence from the record, or misstated the record. The Court simply cannot determine whether substantial evidence supports the ALJ's conclusions if the ALJ does not more clearly identify what specific evidence she relied on, so that the Court can determine if the record actually says what she represents that it says. Certainly, if

18

Plaintiff and the Commissioner were able to hunt through the records to find evidence to support their positions, the ALJ just as easily could have done so to begin with. Because she did not do so, the Court cannot determine whether the evidence she asserts that she relied on actually supports the conclusions and ultimate decision she reached. It is not the Court's role to sift through an 863-page DOD record and a 462-page DOD record, among others, let alone the entire 1,676-page record, hunting for evidence from the record that matches the ALJ's conclusions.

As a result, the Court **FINDS** that the ALJ erred in not supporting her conclusions with substantial evidence.

## C. The ALJ erred by applying an improper legal standard to evaluate Plaintiff's fibromyalgia.

While Plaintiff does not raise the issue directly in her brief, the Court is empowered to consider *sua sponte* the ALJ's error in applying an improper legal standard to evaluate Plaintiff's fibromyalgia. *Ricks*, 2010 WL 6621693, at *7. The ALJ's misunderstanding of fibromyalgia is evident from her opinion and conclusions, absent any analysis whatsoever, that Plaintiff did not meet the diagnostic criteria for fibromyalgia.

SSR 12-2p outlines two sets of criteria by which an ALJ may determine, upon review of a claimant's medical records and Medical Source Statements, whether a claimant has a medically determinable impairment of fibromyalgia. First, the 1990 ACR Criteria for the Classification of Fibromyalgia establishes that a claimant has a medically determinable impairment of fibromyalgia if she has all three of the following:

> 1. A history of widespread pain . . . that has persisted (or that persisted) for at least 3 months. The pain may fluctuate in intensity and may not always be present.
> 2. At least 11 positive tender points on physical examination . . .[3]

---

[3] There are eighteen total tender point sites located on each side of the body at the base of the skull, back and side of the neck, shoulder, near the shoulder blade, top of the rib cage, outer aspect of the elbow, top

3.  Evidence that other disorders that could cause the symptoms or signs were
    excluded.

SSR 12-2p, 2012 WL 3104869 (Jul. 25, 2012).  Similarly, the 2010 ACR Preliminary Diagnostic

Criteria state that a claimant has a medically determinable impairment of fibromyalgia if she has

all three of the following criteria:

1. A history of widespread pain . . .
2. Repeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-
occurring conditions, especially manifestations of fatigue, cognitive or memory
problems ("fibro-fog"), waking unrefreshed, depression, anxiety disorder, or
irritable bowel syndrome; and
3. Evidence that other disorders that could cause these repeated manifestations of
symptoms, signs, or co-occurring conditions were excluded.

*Id.*

The ALJ, referencing the Navy's Medical Board report[4] regarding Plaintiff's fibromyalgia,

concluded without any analysis that the Navy's standards for diagnosing fibromyalgia were

different from SSR 12-2p, and that Plaintiff did not meet the 12-2p criteria.  R. at 27.  This

conclusion was clearly erroneous for several reasons.  First, Plaintiff's DOD record clearly

establishes that the Navy utilizes the same ACR criteria that was adopted by SSR 12-2p.  *See* R.

at 699 (Plaintiff "meets ACR 2010 diagnostic criteria for fibromyalgia").  Of course, SSR 12-2p

literally adopted, in addition to the 1990 ACR criteria, the 2010 ACR Preliminary Diagnostic

Criteria, which the Navy followed.  *See* SSR 12-2p.  The ALJ's assertion to the contrary was

simply wrong.

Furthermore, the Navy's Medical Board report referenced by the ALJ actually supports the

conclusion that Plaintiff meets the SSR 12-2p criteria.  R. at 1663–65.  According to the American

---

of the buttock, below the hip, and the inner aspect of the knee.  SSR 12-2p, 2012 WL 3104869 (Jul. 25,
2012).
[4] The ALJ's reference to this report was one of the few instances in her decision where she cited a specific
record entry.

College of Rheumatology, the 2010 criteria for diagnosing fibromyalgia requires that the patient: (1) has a "[w]idespread pain index (WPI) ≥7 and symptom severity (SS) scale score ≥5 or WPI 3– 6 and SS scale score ≥9," (2) has symptoms that "have been present at a similar level for at least 3 months," and (3) "does not have a disorder that would otherwise explain the pain." Frederick Wolfe et. al., *The American College of Rheumatology Preliminary Diagnostic Criteria for Fibromyalgia and Measurement of Symptom Severity*, 62 Arthritis Care & Rsch. 600, 607 (2010). WPI measures the number of "areas in which the patient has had pain over the last week," similar to a tender point analysis, and has a maximum score of 19. *Id.* The SS scale score is the "sum of the severity of the 3 symptoms (fatigue, waking unrefreshed, cognitive symptoms) plus the extent (severity) of somatic symptoms in general" and has a maximum score of 12. *Id.* Somatic symptoms include muscle pain, IBS, fatigue, dizziness, insomnia, and depression, among others. *Id.* These criteria, which are also promulgated in SSR 12-2p, are demonstrated by the record.

First, an addendum to the report, prepared by Jeffery C. Eickhoff, MD, states that Plaintiff has "multifocal axial/peripheral pain above/below waist, non-restorative sleep pattern and extreme fatigue for >3months." R. at 1661. Second, Dr. Eickhoff noted that Plaintiff has "18/18 tenderpoints" and "[p]oor sleep, [c]ognitive problems ("fog"), frequent headaches, anxiety/depression, [and] functional bowel disorder (IBS)." *Id.* Finally, Dr. Eickhoff states that Plaintiff's "current symptoms are not explained by an inflammatory arthritis or other autoimmune process." *Id.* Thus, Plaintiff's symptomology as described in the Medical Board report meets both the 1990 and 2010 ACR diagnostic criteria found in SSR 12-2p. Indeed, the medical record contains other references to fibromyalgia symptomology that are identified in the SSR 12-2p criteria. *See, e.g.*, R. at 489 ("Whole body pain"); R. at 699 ("Chronic (>3 mo) multifocal pain," "Nonrestorative sleep/severe fatigue," "Cognitive problems ('fog')," "Functional bowel disorder

(IBS)," "Frequent headaches," "Comorbid anxiety/depression," "Tenderpoints: 18/18"). The ALJ failed to provide any explanation or analysis why she determined that fibromyalgia was a "non-medically determinable impairment," nor why Plaintiff did not meet the relevant listing in SSR 12-2p. R. at 27. Without such analysis, at best the Court cannot determine whether the ALJ applied the proper legal standard in evaluating Plaintiff's fibromyalgia in the first instance.

Recent Fourth Circuit jurisprudence in *Arakas v. Commissioner*, 983 F.3d 83 (4th Cir. 2020), establishes the appropriate legal standard for evaluating claims of fibromyalgia. In *Arakas*, the Fourth Circuit reversed a similar finding because of the ALJ's "failure to understand and consider the unique nature of fibromyalgia." *Id.* at 95. Arakas was fifty years old when she first applied for disability insurance benefits. *Id.* at 90. She had previously worked as a dining room manager but stopped working fulltime in 2010 due to her alleged disability. *Id.* at 90-91. Among her many medical conditions that presented possible limitations, including degenerative disc disease and carpal tunnel syndrome, the most significant was fibromyalgia. *Id.* at 91. Arakas's treating rheumatologist diagnosed her with fibromyalgia based on his findings of "exquisitely tender trigger points" throughout her neck and shoulder muscles, hips, knees, and upper, mid, and lower back, which were consistent with the diagnostic criteria of the ACR. *Id.* The rheumatologist consistently noted that she generally maintained a full range of motion in her joints and had no signs of active joint inflammation, both of which are typical of fibromyalgia. *Id.* The prescribed treatment included physical therapy, various medications specifically for fibromyalgia, antidepressants that help control neuropathic pain, and narcotic painkillers. *Id.*

Arakas initially filed for disability in 2010, alleging disability based on various conditions including fibromyalgia. *Id.* at 91–92. Her claim was denied by the ALJ and Appeals Council. *Id.* at 89. The District Court reversed and remanded the case, instructing the Commissioner to "make

22

findings of fact regarding an opinion letter submitted to the Appeals Council by Dr. Frank Harper,

Arakas's longtime treating physician, in support of her application." *Id.* On remand, the ALJ

again denied her claim, and Arakas appealed to the District Court. *Id.* A Magistrate Judge

recommended, and the District Court later adopted, the affirmance of the Commissioner's second

denial. *Id.* Arakas made a timely appeal to the Fourth Circuit. *Id.* at 90.

During the course of Arakas's proceeding, Dr. Harper provided three opinion letters

explaining the basis for Arakas's diagnosis and the extent of her treatment for fibromyalgia. *Id.* at

92. Dr. Harper specifically emphasized that "fibromyalgia typically did not produce laboratory

abnormalities, disagreeing with the ALJ's reliance on the lack thereof." *Id.* In each of Dr.

Harper's letters he described the chronic pain and fatigue caused by Arakas's fibromyalgia and

stressed her inability to "sustain work even at a light exertional level full time." *Id.* In contrast,

the state agency consultants who assessed Arakas' physical and mental limitations concluded that

she had the requisite findings for fibromyalgia but could still perform certain functions with little

or no limitation. *Id.* Similarly, the state agency psychologists deemed Arakas's mental

impairments non-severe, but stated that the "chronic pain and fatigue produced by fibromyalgia

could be causing Arakas's depression and her problems with attention and concentration," which

might interfere with her ability to work full-time. *Id.* at 93.

In reviewing the ALJ's application of the typical two-step process, the Fourth Circuit took

specific issue with how the ALJ comparatively weighed the subjective and objective medical

evidence of Arakas's alleged disability.

> The Fourth Circuit "has battled the [Commissioner] for many years over how to
> evaluate a disability claimant's subjective complaints of pain." In fact, the two-step
> process that SSA uses to evaluate symptoms was born out of a long history of
> disagreements between this Court and the agency over this very issue. Since the
> 1980s, we have consistently held that "while there must be objective medical
> evidence of some condition that could reasonably produce the pain, there need not

23

be objective evidence of the pain itself or its intensity." Rather, a claimant is "entitled to rely exclusively on subjective evidence to prove the second part of the test."

*Id.* at 95 (citations omitted). The Fourth Circuit held that the ALJ disregarded this precedent by improperly discounting subjective complaints of pain and fatigue, and improperly elevating the need for objective medical evidence to substantiate Arakas's statements. *Id.* at 95–96.

This type of legal error is particularly significant in a case involving fibromyalgia, as the symptomology is entirely subjective, with the exception of the objective tender points assessment. *Id.* at 96. When diagnosing and assessing the severity of fibromyalgia, physical examinations "will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." *Id.* at 96 (quoting *Green-Younger v. Barnart*, 335 F.3d 99, 108–09 (2d Cir. 2003). Thus, findings that effectively require objective evidence for a disease characterized by subjective symptoms are erroneous. The Fourth Circuit also noted that this error was particularly egregious in Arakas's case as Dr. Harper's opinion letters explicitly emphasized the unique nature of fibromyalgia and the absence of objective abnormalities. *Id.* at 96.

The most recognized and only objective medical evidence of fibromyalgia are trigger-point findings, i.e. tenderness in specific sites on the body.[5] In *Arakas*, the ALJ repeatedly referenced a lack of objective medical evidence supporting the Plaintiff's complaints, while simultaneously disregarding the objective evidence proffered regarding her tender point findings. *Id.* at 96, 97. The ALJ claimed that the findings were based on a multitude of factors, not just the objective medical evidence or lack thereof. *Id.* However, the Fourth Circuit found that the ALJ had

---

[5] Throughout the relevant sources of authority, "trigger points" and "tender points" are used interchangeably to describe the objective assessment of extreme tenderness in specific sites on the claimant's body. In accordance with the terminology used in SSR 12-2p, the undersigned will proceed using the term "tender points".

erroneously relied on, and effectively required, objective medical evidence of fibromyalgia.  *Id.*

The Fourth Circuit further summated,

> Today, we join those circuits by holding that ALJs may not rely on objective
> medical evidence (or the lack thereof)—even as just one of multiple factors—to
> discount a claimant's subjective complaints regarding symptoms of fibromyalgia
> or some other disease that does not produce such evidence.  Objective indicators
> such as normal clinical and laboratory results simply have no relevance to the
> severity, persistence, or limiting effects of a claimant's fibromyalgia, based on the
> current medical understanding of the disease.  If considered at all, such evidence—
> along with consistent trigger-point findings—should be treated as evidence
> substantiating the claimant's impairment.  We also reiterate the long-standing law
> in our circuit that disability claimants are entitled to rely exclusively on subjective
> evidence to prove the severity, persistence, and limiting effects of their symptoms.

*Id.* at 97–98.  Ultimately, the court held that the ALJ's evaluation was erroneous as it was based

on an "incorrect legal standard as well as a critical misunderstanding of fibromyalgia."  *Id.* at 98.

The ALJ in this case has similarly erred in her assessment of Plaintiff's fibromyalgia.  Here,

the ALJ found that the Plaintiff had not been diagnosed with fibromyalgia consistent with SSR 12-

2p.  R. at 27.  However, as previously noted, Plaintiff's diagnosis of fibromyalgia appears to meet

both standards of SSR 12-2p.  R. at 1663–65.  Further, absent any analysis whatsoever by the ALJ,

who incorrectly found that the Navy did not follow the ACR criteria, the Court cannot find that

the ALJ applied the proper legal standard.  Without understanding how the ALJ evaluated

Plaintiff's fibromyalgia, the Court cannot determine whether the ALJ appropriately followed the

precedent of *Arakas*.

Therefore, the Court **FINDS** that the ALJ did not apply the proper legal standard in

evaluating Plaintiff's fibromyalgia.

**D. On remand the ALJ should address the potential errors in her decision.**

While the Court has found that remand is necessary for the ALJ to explain the "accurate

and logical bridge from the evidence to [her] conclusion," *Monroe*, 826 F.3d at 189, and so that

she can apply the proper legal standing in evaluating Plaintiff's fibromyalgia, the Court also notes that the parties would benefit from having the ALJ address the potential errors in her decision that were noted by Plaintiff in her brief. For instance, Plaintiff contends, although she provides no support, that the ALJ misconstrued the role of performance appraisals and fitness for duty evaluations in the military, and consequently reached conclusions about their significance that were unrelated to their actual purpose. ECF No. 15 at 11. Plaintiff further points out that the ALJ specifically found that "the records clearly indicate the claimant does not have POTS," thus finding it to be a non-medically determinable impairment, yet the records are replete with this diagnosis which the ALJ herself references multiple times in her decision.[6] *Id.* at 8 (quoting R. at 27). While Plaintiff suggests the ALJ may have made a typographical error in stating that the records "clearly indicate the claimant does *not* have POTS," if this is an error the ALJ would be wise to address the basis for her conclusion that this medical condition was a non-medically determinable impairment. R. at 27 (emphasis added). Alternatively, if this was not an error and the ALJ intended to conclude that Plaintiff does not have POTS, then the ALJ should explain the basis for this finding, which appears to be patently contradicted by the numerous medical record entries, *see, e.g.*, R. at 1005, 1657, 1663–65, and her own decision, *see* note 6, *supra*.

**E. On remand the parties should be prepared to address the impact of *Bird*.**

Finally, Plaintiff raises one other issue that the Court will briefly address, namely the ALJ's failure to consider the Plaintiff's VA disability rating in her decision, in accordance with *Bird v. Commissioner*, 699 F.3d 337 (4th Cir. 2012).[7] ECF No. 15 at 10. The Commissioner responded

---

[6] *See, e.g.*, R. at 30 ("Based on a prior diagnosis of POTS, the claimant was put on limited duty . . .," "On March 22, 2018 she was seen in follow up for POTS"); R. at 33 ("On December 31, 2018, she was seen at Walter Reed National Military Medical Center for POTS"); R. at 34 ("She was fit for duty as of August 24, 2018 from a psychological perspective and in March 2019 except for POTS").

[7] *Bird* held, *inter alia*, that the Commissioner was required to give substantial weight to another agency's disability determination, unless she distinguished the determination by objective evidence in the record.

that this part of *Bird* was superseded when the SSA amended its regulations, 20 C.F.R. § 404.1520b(c), effective March 17, 2017, specifically providing that it would no longer consider disability determinations made by other agencies. ECF No. 18 at 24–25. Plaintiff's reply brief failed to address the Commissioner's contention. ECF No. 20. While some courts have held that this regulation did not supersede the *Bird* court's holding, *see Lewis v. Saul*, No. 7:20-CV-50, 2021 WL 2144327 (E.D.N.C. May 26, 2021); *Rose v. Saul*, No. 7:19-cv-91, 2020 WL 4740479 (E.D.N.C. Aug., 14, 2020); *Wright v. Saul*, No. 3:20-CV-201, 2021 WL 1124784 (W.D.N.C. Mar. 24, 2021); *Van Cleave v. Saul*, No. 1:20-CV-144, 2021 WL 2078004 (W.D.N.C. May 24, 2021), other courts have found that it did. *See Hagan v. Saul*, No. 9:19-2591, 2021 WL 1430914 (D.S.C. Jan. 15, 2021); *Pirolo v. Saul*, No. 5:19-cv-2881, 2021 WL 389250 (D.S.C. Feb. 4, 2021). Consideration of this issue requires substantive briefing, which has not occurred in this case, inasmuch as Plaintiff failed to discuss the ramifications of the new SSA regulation in her primary brief or her reply. Accordingly, this issue has not been fully addressed for the Court's consideration, and the Court therefore declines to address this issue now.

Nevertheless, for the reasons discussed above, the Court **FINDS** that this matter should be remanded to the Commissioner for further proceedings on the bases articulated above. Additionally, to the extent that Plaintiff wishes to pursue the application of *Bird* in light of the new 20 C.F.R. § 404.1520b(c), she should be prepared to fully address the Commissioner's contentions.

## VI. RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 14, be **GRANTED**, the Commissioner's Motion for Summary Judgment, ECF No. 17, be **DENIED**, and the final decision of the Commissioner be **VACATED and REMANDED.**

## VII. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1.  Any party may serve on the other party and file with the Clerk of this Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2.  A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to mail a copy of this Report and Recommendation to all counsel of record.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
June 29, 2021

28